Heffron v. Gore.

PATRICK H. HEFFRON

v.

JAMES J. GORE.

*Partnership—Dissolution—Accounting—Practice.*

1. A bill joining two or more distinct subjects is multifarious; an objection to a bill upon this ground can only be raised by demurrer specifying it as a ground of objection; if not so raised it will be considered waived.

2. Either party to a given controversy who may wish to object before the master, and except before the court, to the allowance or disallowance of

an item, should require the master to state the evidence and reasons upon which he allows or disallows the same.

3. Upon a bill filed for the dissolution of an alleged partnership and for an accounting, it being likewise sought to settle certain questions touching leasehold interests in lots named, this court holds that the decree of the trial court in behalf of the complainant is erroneous, the contract between the parties hereto having fixed the mode by which he was to be reimbursed for advances made to improve the lots in question, and reverses the same.

[Opinion filed March 13, 1891.]

Appeal from the Superior Court of Cook County; the Hon. Egbert Jamieson, Judge, presiding.

Messrs. Osborne Bros. & Burgett, for appellant.

Messrs. C. H. Remy and J. M. Flower, for appellee.

Gary, J. This is a case in which parties commencing their business relations with the utmost confidence in each other, have gone on so loosely, that it will probably be impossible for any tribunal to decide upon their respective rights with entire confidence that justice is done to them respectively.

It is certain that by various assignments Heffron became possessed, before any dissensions arose between them, of a lease for a term running to the 30th day of April, 1979, of lots 14, 15, 16 and 17, in block 115, in the school section addition to Chicago, subject to $14,000 annual rent, and to $250,000 incumbrances by mortgage; half on lots 14 and 17, and the other half on lots 15 and 16.

At first Heffron had a lease only for the east eighty feet, fronting one hundred and one and one-half feet on Clark street, of lots 15 and 16, and while he had that only, he and Gore met at the Hot Springs, in Arkansas, and made a verbal agreement, either that Gore should pay Heffron $6,000 for one-half of Heffron's interest, (this is Gore's version,) and advance $40,000 to erect a one story and basement building, or (and this is Heffron's version) that for such one-half interest Gore should advance $12,000, and all money necessary to erect a one story and basement brick and stone building of

Heffron v. Gore.

sufficient strength to bear the weight of seven or eight additional stories to be erected later ; under either version Gore's advances were to bear interest at seven per cent; they were to be repaid from the net income of the property, after paying the ground rents, taxes, interest on mortgages, etc., and Heffron was to manage the property.    The only discrepancy between their versions that is material, is, whether Gore was to pay $6,000 as price of a half interest, or advance $12,000, to be repaid from the income of the property, and even as to that, the version of either party is $3,000 more favorable to his adversary than such adversary claims.

They went on and erected an eight story building, finished it off as a hotel, with stores and offices to let in addition to the hotel part, and no tenant for the hotel being found. Heffron began keeping a hotel (which seems to have been a new business to him) in their joint names as proprietors, From the evidence it is a fair, if not a necessary, conclusion, that the profits of the hotel are to be treated as income of the property, and therefore to be applied to the charges upon the property and the repayment of Gore's advances.    Though this first agreement was made when Heffron had an interest in but part of the whole property, yet by their later arrangements, the interest of Gore was extended to the whole of all the lots.

To recite all their negotiations and agreements would occupy too much space.

The only writings between them are shown by the record, as follows:

First:    " Memorandum of agreement between Patrick H. Heffron and James J. Gore, made this 1st day of November, 1886.

" Said Gore agrees to advance money sufficient to complete the building now in process of erection upon the east eighty feet of lots 15 and 16, in block 115, in school section addition to Chicago, Illinois, in consideration of the assignment by said Heffron to said Gore of the lease of said property, made by the Chicago Open Board of Trade to said Heffron, dated September 1, 1885, which said Heffron has this day as-

signed to said Gore as security for one-half of such advances, both already advanced and to be advanced.

"JAMES J. GORE."

Second: "This indenture, made this 25th day of January, 1887, by and between James J. Gore, of Chicago, Illinois, party of the first part, and Patrick H. Heffron, of the same place, party of the second part, witnesseth:

"That whereas, by a certain indenture of lease, made September 1, 1885, between the Chicago Open Board of Trade and said Heffron, the said Open Board of Trade did demise and lease to said Heffron the east eighty feet of lots 15 and 16 in block 115 in the school section addition to Chicago, Illinois, and by a certain other indenture of lease made April 30, 1886, between the same parties, the said Chicago Open Board of Trade did demise and lease to said Heffron the west 9 feet and 11 inches of said lots 15 and 16, to have and to hold the same to the said Heffron from the dates of said leases, for, during and until April 30th, 1979, for the stipulated rental to be paid by said Heffron to said Chicago Open Board of Trade of $7,500 per annum, payable as in said leases mentioned, and upon other conditions and stipulations in said leases mentioned, which said leases between said Chicago Open Board of Trade and said Heffron are hereby referred to and made part of this agreement.

"And whereas, said Heffron has this day, by a certain deed of assignment, conveyed and assigned to said Gore all the right, title and interest of said Heffron in and to the said leases so made, as aforesaid, by said Chicago Open Board of Trade to said Heffron, and all his, said Heffron's, right, title and interest so acquired by said leases in and to the said premises described therein.

"Now, therefore, this agreement witnesseth that said conveyances and assignments so made, as aforesaid, by said Heffron to said Gore were so made by said Heffron upon the following terms and conditions: That said Gore shall advance a sum of money sufficient to complete the building now in process of erection upon the premises described as aforesaid; and for such purpose it is agreed between the parties hereto

that said Gore may, from time to time, as he shall deem advisable, borrow upon security of said leases, in the name of said James J. Gore, such sum or sums of money as he, said Gore, may deem necessary for the purpose of constructing and completing the building aforesaid, and in his, said Gore's, own name, to make, execute and deliver such trust deeds or mortgages upon said premises as may be from time to time, in the judgment of said Gore, found necessary to raise sufficient money to finish to completion the said building. But it is distinctly understood and agreed that the money to be borrowed and secured by mortgage or trust deed upon said premises shall be the greatest amount that it shall be possible to borrow upon said leasehold interest and the improvement to be erected thereon, and such loan shall run for as long a time and at as low a rate of interest as it is possible for him to obtain the same.

" It is further agreed and understood between the parties hereto, that the rents, issues, income and profits to be derived from said building shall be received, devoted to and used by the parties hereto for the following purposes:

"1.   In the payments and discharge of the covenants, agreements and obligations imposed upon said property by the leases so made as aforesaid by the Chicago Open Board of Trade to said Heffron.

"2.   To the payment and discharge of the expenses and costs incurred in the maintenance and care of said buildings, and the payment of any interest upon any mortgage or trust deed made by said Gore upon said property.

"3.   To the payment of reimbursement to said Gore of all moneys advanced by him personally and other than that borrowed upon the property, with seven per cent interest per annum, to said Gore for such advances.

"4.   Whenever and at such time as said Gore shall have received of the rents, issues and profits, sufficient to have paid and discharged the current obligations aforesaid, and shall have entirely paid and reimbursed himself for all moneys, with the interest thereon, so advanced by him outside and exclusive of any mortgage made upon the property, then and

at such time the said Gore shall execute and deliver to said
Heffron a conveyance and assignment of an undivided half
interest in and to said leaseholds, together with the improve-
ments thereon and the appurtenances thereto, and from the
time of such payment and conveyance to said Heffron of an
undivided half interest in and to said leaseholds, the said Heff-
ron and Gore shall from such time be possessed, hold and
enjoy the said property, leaseholds and estates as tenants in
common, each of an equal undivided interest therein.

"It is further distinctly understood and agreed that said
Heffron is to give as much of his time as possible toward
superintending and pushing the erection to completion of
said improvements, and when said improvements are com-
pleted, said Heffron is to look after and have the care and
management of said buildings, but no leases of said premises
shall be given, or contracts for the payment or disbursement
of money shall be made without the consent of both parties
hereto.

"Witness the hands and seals of the parties the day and
year first above written.

      "JAMES J. GORE,   [SEAL.]
      "PATRICK H. HEFFRON. [SEAL.]"

And the third and last: A writing, dated November 1,
1888, which is simply an assignment by Heffron to Gore of a
half interest in the leasehold in all the lots. It is undoubtedly
true that the long agreement of January 25, 1887, defines
their relation to each other as to all the lots, as they understood
them, if the keeping of the hotel were left out of consider-
ation.

As to the conduct of the hotel, and the money expended in
furnishing it, the fair result from all the evidence is, that
they were partners; they drifted into that partnership with-
out any agreement except such as is to be implied from
their acts. But the fact that they were partners in the hotel
business did not change their relations as to the leasehold
estates in the four lots. Keeping the hotel was but a tem-
porary shift, not a permanent business. It happened merely
as an incident to their principal enterprise.

Dissensions having arisen, a winding up of the hotel business in the usual mode in chancery is proper, and whatever may be realized from it should, if not needed for prior charges upon the leaseholds, go to Gore; and if, upon an adjustment of those partnership accounts, any balance is due from Heffron to Gore after exhausting the assets of the hotel partnership, he may have therefor a decree against Heffron, to be enforced by execution, as are other money decrees in chancery. But the decree appealed from goes much further. Gore has filed his bill for an account of the whole business between him and Heffron.

He has obtained a decree that a partnership exists between the parties, not only as to the hotel business and furniture, but as to the leasehold estate in all the lots; that Heffron is indebted to the partnership (the assets of which, as the court has found it to exist, remain undisposed of) in the sum of $10,316.12, which he is directed to pay to the receiver in ten days, and in default of payment, execution to issue; that the whole property, leaseholds, hotel furniture and fixtures be sold as a whole at auction on thirty days notice, with careful provision for publication of notice, but no bid to be received that will not pay claims specified.

In the course of the erection of the building, Gore and Heffron became indebted to divers persons for work and materials, of which the decree finds $123,926.83 is unpaid.

In November, 1888, Gore and Heffron executed notes for such indebtedness, running one, two and three years, secured by a deed of trust in the nature of a mortgage upon their interest in all the lots. The creditors so secured were not parties to the suit; the largest part of their notes had not become due when the decree was entered, April 16, 1890, but the decree applies the proceeds to the payment of those notes. The decree finds that there is an unsecured indebtedness of Gore and Heffron of $16,421.08, and directs that it be paid from the proceeds. The decree finds that the money advanced by Gore, with accrued interest, amounts to $212,-472.31, and directs that he be paid out of the proceeds.

This decree is a great hardship upon Heffron. It is not in

accordance with the contract between the parties.  Gore is entitled to a winding up of the hotel partnership, with or without good reason for asking it.  2 Lind. Part. 570.

Upon such dissolution he is entitled, if that partnership has not been carried on at a loss, to have back the money he has invested in it, forthwith, either from the assets of that partnership or from Heffron personally.  If it has been conducted at a loss, or if Heffron is responsible to Gore for any balance on account thereof, Gore's advances on the leaseholds are not thereby increased.

As to the leaseholds, it may well be that upon a bill filed for that purpose (which this is not), if there were any dispute as to the amount of Gore's advances, that amount might be fixed by a declaratory decree.  See cases in note 3, Dan. Chy., 2180, Ed. 1879.

And if Heffron has misapplied or converted to his own use any portion of such advances, a money decree against him for that might, under proper allegations, be one of the results of such a bill.  So if Heffron ought not, for any sufficient reason, to be left in the control and management of the property, a court of equity may appoint a receiver.

But the mode by which Gore is to be reimbursed for his advances has been fixed by contract between the parties.

" The court can not go beyond the contract of the parties, or a due application of the general principles of equity in cases to which the express contract does not apply."  Lord Eldon, in Waters v. Taylor, 15 Vesey, 10.

And considering the expense of a long continuance of the property in the hands of a receiver, and the difference that there will generally be between his management and that of a careful and vigilant owner, and the time that must elapse before the net income will repay Gore, other remarks of Lord Eldon, at the close of the case cited, are not inapplicable to this.

Whatever profit Gore may realize from the hotel partnership, if any, will go as a credit upon his advances, but that circumstance does not make the dissolution of that partnership part of one subject-matter, of which the relations of Gore and

Heffron as to the leaseholds are another part, so as to permit the entire business between them to be the subject of one bill. It is merely a possible or probable contingency that there will be such profit. If there should be no such profit, then the winding up of the hotel partnership will have no effect upon their other relations. A bill joining two or more distinct subjects is multifarious. 1 Dan. Chy. 334, where many cases are collected in a note. On the present bill only the hotel partnership should be considered.

The rule on this subject of multifariousness is very vague, and the objection should be taken on demurrer, or it is waived by the party. Labadie v. Hewitt, 85 Ill. 341.

But it is still open to the court itself. Story Eq. Pl., Sec. 271, note. In this case the inconveniences and confusion resulting from carrying on the two independent lines of investigation in one suit, in which the appellee, if successful, is entitled to different kinds of relief, are so great that the objection should be taken by the court. As the hotel partnership assets have gone into the hands of a receiver, and that partnership is in the course of liquidation, the appellee must elect whether he will dismiss his whole bill without prejudice, or, by amendment, confine it to the winding up of that partnership. If he elect so to amend, the accounts to be stated will be voluminous.

"The court will not wander at large into the evidence," and therefore either party who may wish to object before the master, and except before the court, to the allowance or disallowance of any item, should require the master to state the evidence and reasons upon which he allows or disallows that item. Donnell v. Columbian Ins. Co., 2 Sumner, 366; 2 Dan. Chy., 1300 *et seq.* and notes. Cases cited in Huling v. Farwell, 33 Ill. App. 238. And something is to be expected from the good faith of counsel, that captious objections will not be made.

The decree must be reversed and the cause remanded for further proceedings not inconsistent with this opinion. The case is a good one for old friends to get together, forgive and forget, and with the aid of competent bookkeepers, adjust, without further litigation, ruinous by expenses.

*Reversed and remanded.*